## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FRANCIS HOUSTON, on behalf of himself
and all others similarly situated,

                                         Case No.:
                                         Division:

      Plaintiff,

v.                                     **CLASS REPRESENTATION**
                                         **JURY TRIAL DEMANDED**

CENTENE MANAGEMENT COMPANY, LLC,
CELTIC INSURANCE COMPANY, and
SUNSHINE HEALTH COMMUNITY
SOLUTIONS, INC.

      Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiff Francis Houston ("Plaintiff") brings this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), individually and on behalf of all similarly-situated persons, who were or are Ambetter policyholders from February 15, 2019 to the present, against defendants Centene Management Company, LLC ("Centene"), Celtic Insurance Company ("Celtic Insurance"), and Sunshine Health Community Solutions, Inc. ("Sunshine Health") (together, "Defendants"). Plaintiff's allegations are based on information and belief, except for allegations about Plaintiff's own circumstances.

### I.      PARTIES

1.      Plaintiff Francis Houston is an individual residing in Port Orange, Florida. In or around November 2016, November 2017, and November 2018, Plaintiff Houston bought a Centene Ambetter Health insurance policy from Sunshine Health that is insured by Centene owned Celtic Insurance. Plaintiff Houston's Ambetter policies, for which he paid and continues to pay premiums, went into effect on January 1, 2017, January 1, 2018, and January 1, 2019.

2.      Defendant Centene Management Company, LLC is a Wisconsin corporation with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene is a wholly owned subsidiary of Centene Corporation, a holding company, itself having no employees, which is the corporate pinnacle of a set of wholly-owned subsidiaries who, collectively, constitute one of, and hold themselves out to the public as one of, the nation's largest insurers providing coverage through the ACA and which has steadily been expanding its operations around the country. Centene Management Company, LLC is the corporate entity through which Centene Corporation effectuates the common policies and practices and conduct of its subsidiaries and through which insurance is offered by the "Centene" entity across the nation. Here, Centene effectuates, controls and handles the operations of Defendant Celtic Insurance and Sunshine Health, so they both are a shell and alter ego of Centene, and Centene, Celtic Insurance, and Sunshine Health operate so in concert and together in a common enterprise and through related activities so the actions of one may be imputed to the other and/or that their corporate formality should be disregarded for purposes of attributing their unlawful conduct to Centene. To all intents and purposes, the activities of Celtic Insurance and Sunshine Health have been abdicated to Centene. As used here, "Centene" shall refer to the joint activities of Centene Management Company, LLC, Celtic Insurance Company, and Sunshine Health

3.      Defendant Celtic Insurance Company, is an Illinois corporation with its principal place of business at 7700 Forsyth Blvd. Suite 800, St. Louis, MO 63105. Celtic Insurance is licensed to sell health insurance in the State of Florida. Celtic Insurance is a wholly-owned subsidiary of Centene Corporation and operates in concert with Sunshine Health as the "Centene" presence in the State of Florida by insuring the Ambetter insurance product.

4.      Defendant Sunshine Health Community Solutions, Inc., is a Florida corporation with its principal place of business at 7700 Forsyth Blvd. Suite 800, St. Louis, MO 63105. Sunshine Health is licensed to sell health insurance in the State of Florida. Sunshine Health is a wholly-owned subsidiary of Centene Corporation and operates as the "Centene" presence in the State of Florida, including offering the Ambetter insurance product.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,00 and at least one member of the proposed class is a citizen of a state other than Defendants' states of citizenship.

6.      Venue is appropriate under 28 U.S.C. § 1391(b) and (d) because Defendants reside in this district and are subject to personal jurisdiction in this district.

7.      This court has personal jurisdiction over Defendants because they conduct business throughout the State of Florida.

8.      The Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.      FACTUAL ALLEGATIONS

### A.  The "Centene" Business Model

9.      The "Centene" entities, as reported in the combined and consolidated Centene Corporation financial statements, earned over $48 billion in 2017, and their revenues continue to increase each year.

10.      As throughout the rest of the country, in the State of Florida, the Centene business model is to target low-income customers who qualify for substantial government subsidies while

simultaneously providing coverage well below both what is required by law and what Centene represents it is providing to customers.

11.     Ambetter policyholders around the nation report strikingly similar experiences: after purchasing an Ambetter insurance plan, they learn that the provider network Centene represented was available to Ambetter policyholders was in material measure, if not largely, fictitious. Members have difficulty finding, and often cannot find any, medical providers who will accept Ambetter insurance.

12.     Centene misrepresents the number, location, and existence of purported providers by listing physicians, medical groups, and other providers who do not accept Ambetter (and, in some cases, who have specifically asked to be removed from the Ambetter provider network) as participants in their network and by listing nurses and other non-physicians as primary care providers. Defendants have even copied entire physician directories into their purported network lists for some areas, and have listed medical students as part of their primary care provider network.

13.     Defendants fail to disclose the true limitations of the coverage provided by their Ambetter policies. Ambetter policyholders learn of the limitations on available providers only after they commit to the insurance and are locked into the Ambetter policy. Defendants' sales materials omit that Centene does not adequately monitor their network of providers. The Ambetter documentation also fails to disclose that Centene does not consistently provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services.

14.     In Florida, consumers have complained to the Florida Office of Insurance Regulation regarding Ambetter's provider limitations that were not disclosed.

15.     Defendants also fail to reimburse medical providers' legitimate claims, routinely citing "insufficient diagnostic" evidence as the reason. As a result of Centene failing to pay providers for legitimate claims, a large number of medical providers reject Ambetter insurance, further reducing the provider network available to Ambetter's members.

16.     Centene has been sued by medical providers and by shareholders for failing to fulfill its legal responsibilities, and this lawsuit seeks to compel redress from Centene for its failure to comply with the law and the terms of its contracts on behalf of Ambetter policyholders.

17.     To be clear, Plaintiff and the Class are not challenging the reasonableness of the rates filed with the Florida Office of the Insurance Regulation. Had Centene actually delivered the insurance services for which its filed rates were approved by the OIC, Plaintiff and the Class would not assert a claim. But Centene misrepresented and made material omissions regarding the coverage actually provided by its Ambetter policy, which did not deliver the insurance services for which the OIC approved its filed rates. Centene therefore breached its insurance contracts with Plaintiff and the Class by failing to deliver the insurance services promised and engaged in unfair and deceptive practices by misrepresenting and making material omissions regarding the true scope of Ambetter insurance policies.

**B.  The "Centene" Entities**

18.     The "Centene" companies, together as collectively presented to the public, is or has been the largest Medicaid Managed Care Organization in the country. The "Centene" companies have described themselves as a "platform for government-sponsored programs" serving low-income populations, including some of the nation's most vulnerable people. When the ACA Exchanges became operational in 2014, Centene expanded the operations of the

Centene Corporation owned entities by introducing the Ambetter insurance product, developed specifically for the ACA.

19.     The Centene coordinated entity insures more than one million people through the ACA's state-based health insurance exchanges. About 90% of the marketplace enrollees are eligible for subsidies. The federal government pays cost-sharing subsidies directly to the insurer.

20.     Centene's profitability in the ACA marketplace is due largely to its use of the ACA subsidy program and other government support, while failing to provide the minimal coverage required.

21.     On the ACA exchanges, it is expected that a number of customers will switch in and out of eligibility or will change insurance providers yearly while shopping for policies. This phenomenon is known as "churn." Consequently, every year will bring Defendants new patients unfamiliar with the shoddy nature of Ambetter coverage. "Our game plan was churn. That's it," according to Centene Corporation's CEO. In addition, some customers will not need to utilize medical practitioners in any given year. These customers may unwittingly continue to purchase Ambetter, discovering its inferior coverage only when they need to obtain medical care.

22.     Ambetter is offered in 18 states. Those states include: Arkansas, Arizona, Florida, Georgia, Illinois, Indiana, Kansas, Mississippi, Missouri, New Hampshire, Nevada, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee Texas, and Washington.

23.     Ambetter "is [Centene's] suite of health insurance product offerings for the Health Insurance Marketplace." The "family" of "Ambetter Health Plans" are certified as Qualified    Health    Plan    issuers    in    the    Health    Insurance    Marketplace." https://www.ambetterhealth.com/about-us.html.

24.     The day-to-day operations of the various "Centene" entities are controlled by and through Centene, down to the details. For example, the subsidiaries' web sites each contain language describing Ambetter substantially the same language, and often verbatim.

25.     On the universal Ambetter web site (as opposed to the state-specific sites that each subsidiary posts), it is represented that "Our Ambetter products are offered by Centene Corporation . . .on a local level." https://www.ambetterhealth.com/about-us.html.

**C.  The ACA's Statutory Scheme Governing Health Insurance**

26.     The ACA was enacted by the United States Congress in March 2010 expressly to provide affordable health care coverage to all citizens, regardless of their pre-existing health conditions or other barriers to coverage. 42 U.S.C. § 18001, et seq. As part of its overhaul of health insurance, the ACA enacted provisions aimed at ensuring minimum levels of health care coverage, termed the "Patient's Bill of Rights." The requirements include, among other things, giving patients the right to choose a doctor, the provision of no-cost preventive care, and the ending of pre-existing condition exclusions. 42 U.S.C. §§ 300gg-1- 300gg-19a, https://www.cms.gov/CCIIO/Programs-and-Intitiatives/Health-Insurance-Market-Reforms/Patients-Bill-of-Rights.html; see also 45 C.F.R. Part 147 (Department of Health and Human Services implementing regulations for these rights).

27.     Under the ACA, a Health Insurance Exchange ("HIE") also known as the Health Insurance Marketplace ("HIM"), is a platform through which plans that meet ACA requirements are sold to consumers, 42 U.S.C. § 18031(b). A Qualified Health Plan ("QHP"), as defined in the ACA, is a major medical health insurance plan that covers all the mandatory benefits of the ACA and may be sold through a state HIM. A QHP is also eligible to be purchased with cost-sharing and premium tax credit subsidies.

28.     All QHPs offered in the Marketplace must cover 10 categories of "essential health benefits" with limited cost-sharing, including:

      a.  Ambulatory patient services (outpatient care one can get without being admitted to a hospital);

      b.  Emergency services;

      c.  Hospitalization (surgery; overnight stays, etc.)

      d.  Pregnancy, maternity, and newborn care;

      e.  Mental health and substance use disorder services, including behavioral health treatment;

      f.  Prescription drugs;

      g.  Rehabilitative and habilitative services and devices (services and devices for people with injuries, disabilities, or chronic conditions);

      h.  Laboratory services;

      i.  Preventative and wellness services and chronic disease management; and

      j.  Pediatric services, including oral and vision care (excluding adult dental and vision).

42 U.S.C. § 18022; 42 U.S.C. § 300gg-13.

29.     These "essential health benefits"- including their limitations on "cost sharing" (deductibles, coinsurance, copayments, and similar charges) are minimum requirements for all Marketplace plans. 42 U.S.C. § 18022.

**D.  Other ACA Requirements and Prohibitions**

30.     To help ensure that plans offered on the ACA marketplaces serve the needs of enrollees, the ACA established a national standard for network adequacy. 42 U.S.C. §

18031(c)(1)(B); 45 C.F.R. § 147.200(a)(2)(i)(K). Marketplace plans must maintain "a network that is sufficient in number and types of providers" so that "all services will be accessible without unreasonable delay," and insurers must disclose their provider directories to the marketplace for online publication. 45 C.F.R. § 156.230(b)(2). In addition, the health law requires marketplace plans to include within their networks a sufficient number and geographic distribution of "essential community providers" that serve predominantly low-income, medically-underserved individuals. 42 U.S.C. § 156.235.

31.     A health insurance issuer offering individual health insurance coverage must also provide a current and accurate summary of benefits and coverage to individuals covered under the policy upon receiving an application for any health insurance policy. The required summary must provide:

   a.   A description of the coverage, including cost sharing, for each category of benefits identified by the Secretary in guidance;

   b.   The exceptions, reductions, and limitations of the coverage;

   c.   Coverage examples, reductions, and limitations of the coverage;

   d.   An internet address with a list of providers; and

   e.   An internet address providing information about prescription drug coverage.

45 C.F.R. § 147.200(a)(2).

The ACA does not displace state laws that impose stricter requirements on health care service plans than those imposed by the ACA, and it expressly preserves state laws that offer additional consumer protections that do not "prevent the application" of any ACA requirement.

D.      **State Law Applicable to ACA Insurance Plans**

32.     Most states, including the State of Florida, have laws prohibiting deceptive marketing of insurance plans and failing to provide adequate insurance benefits.

33.     Florida state law requires that insurers' health plan advertising meet specific requirements. "[T]he purpose of these rules is to provide prospective purchasers with clear and unambiguous statements in the advertisement of health insurance, and to assure the clear, truthful and adequate disclosure of the benefits, limitations and exclusions of policies sold as health insurance." 690-150.001 F.A.C.

34.     Florida law prohibits any false or deceptive advertising of health insurance plans, and the misrepresentation of insurance policy provisions. 690-153.002, F.A.C., 626.9541 F.S.

35.     Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") also prohibits unfair or deceptive conduct in trade or commerce. 501.201 F.S.

E.  **Defendants' Coverage is Less than what is Marketed in its Plans**

36.     Defendants describe Ambetter as a Qualified Health Plan as defined in the ACA, which requires that the plan cover all the ACA's mandatory benefits. Defendants specifically represent to prospective and existing customers that "Ambetter Health Plans are certified as Qualified Health Plan issued in the Health Insurance Marketplace" and represent that the plan complies with the requirements of the ACA. https://www.ambeterhealth.com/about-us.html.

37.     Defendants market to prospective customers that "no matter which Ambetter plan you choose, you can always count on access to high quality, comprehensive care that delivers services, support and all of your Essential Health Benefits." Of the three Ambetter plans offered, Bronze, Silver, and Gold, Defendants assure potential customers that "the only difference

between these plans is how much premium you'll pay each month and how much you'll pay for certain medical services."

38.     Defendants state that Ambetter provides "Complete medical coverage that meets your medical needs and contains all of the Essential Health Benefits." Defendants provided details of these purported benefits and coverage in brochures made available to the public on their websites. Defendants assure the public in those materials that the promised coverage will be provided to customers.

39.     Defendants also describe their "Provider Network Design" in advertising Ambetter on the website they dedicate to the plan. Specifically, Defendants state in their marketing material:

> The Ambetter network includes healthcare providers to deliver all of the services that the Affordable Care Act describes as Essential Health Benefits. These include:
>
> Preventive care
> Hospitalization coverage
> Emergency services
> And more (refer to your Evidence of Coverage (EOC) for the full list of benefits)
>
> To accomplish these goals, Ambetter contracts with a full range of Practitioners and providers such as:
>
> Primary care doctors
> Behavioral health practitioners
> Specialty physicians, such as cardiologists, neurologists, etc.
> Providers, including hospitals, pharmacies, medical equipment companies, etc.
>
> Ambetter makes sure practitioners and providers of all types are available within a certain geographic mileage or driving time from each of our members' homes to ensure you receive quality care in a timely manner.
>
> Ambetter contracts with providers who accept our contract terms, meet our credentialing criteria, and agree to our reimbursement

terms. We regularly review the provider network and make decisions
About which providers remain in the network and if additional
Providers are needed, based on relevant factors that could include:

The availability of certain types of practitioners or hospitals in your
area.

The ability of practitioners to meet our credentialing criteria,
including a valid license to practice, applicable education and
training, appropriate work history, etc.

Assessment of facilities such as hospitals, to ensure they are
appropriately licensed and accredited.

Monitoring of the quality of care and service provided by individual
practitioners and providers, which includes complaints from
members and patient safety concerns.

https://www.ambetterhealth.com/find-a-provider/provider-network-design.html

40.     Defendants advertise that potential customers can use Defendants' websites to see
the providers they represent as in their provider network. Specifically, Defendants' websites
offered, and continue to offer, a feature allowing potential enrollees to search Defendants'
networks of providers. This feature is available to all potential Ambetter customers across the
country. *See* https://providersearch. ambetterhealth.com/.

41.     Defendants appear to have copied contact information about various physicians
from lists or medial directories and listed those providers as being part of their network even
though those providers were not actually part of the provider network for Ambetter. In some
areas, Defendants have simply copied into their purported network an entire physician directory.
In some cases, Defendants have even listed the cellular telephone number of physicians not in
the Ambetter network. In fact, Defendants have listed medical students, nurses, and other non-
physicians in their list of in-network primary care providers.

42.     Defendants' provider network was and is so limited that holders of Ambetter policies would have to travel long distances to see a medical provider, if one legitimately within Defendants' network could be found.

43.     Defendants' online brochures and other materials available to prospective members further represent that members' grievances will be diligently documented by Defendants and promptly addressed.

44.     The Centers for Medicare and Medicaid Services ("CMS") audited Centene's Medicare operations from May 16, 2016 through May 27, 2016. CMS auditors reported that (1) Centene failed to comply with Medicare requirements related to Part D formulary and benefit administration and coverage determinations, appeals, and grievances, and that (2) Centene's failures were systemic and adversely affected enrollees. According to CMS, the enrollees experienced delayed or denied access to covered benefits, increased out-of-pocket costs, and/or inadequate grievance or appeal rights. https://ww.cms.gov/Medicare/Compliance-and-Audits/Part-C-and-Part-D-Compliance-and-Audits/Downloads/Centene_Corporation_CMP_1-12-17.pdf.

45.     Further evidence of Ambetter's wrongful and illegal actions is captured by the Washington State Office of the Insurance Commissioner's order of December 12, 2017 requiring Coordinated Care, a wholly-owned subsidiary of Centene Corporation, operating as the "Sunshine" analogue in the State of Washington, including offering the Ambetter insurance product, to stop selling the Centene 2018 Ambetter plans. The Insurance Commissioner intervened after receiving over 100 consumer complaints regarding a lack of doctors in the Ambetter policy network and other deficiencies and after doing its own investigation.

46.     On December 15, 2017, Coordinated Care entered into a consent order with the Washington Insurance Commissioner. The order states that "[b]ased upon the number of consumer complaints and information gathered by the Insurance Commissioner's staff in investigating the consumer complaints, there was sufficient evidence to indicate that the Company failed to monitor its network of providers, failed to report its inadequate network to the Insurance Commissioner, and failed to file a timely alternative access delivery request to ensure that consumers receive access to healthcare providers."

47.     The order also states that Coordinate Care is legally required to provide access to "medically necessary care on a reasonable basis" without charging for out-of-network services. The Insurance Commissioner stated that the order required that Centene and Coordinated Care no longer send customers "surprise" bills, including charges for out-of-network care. The Consent Order requires Centene and Coordinated Care to confirm that erroneous billing of customers is corrected and provides for ongoing monitoring.

48.     The Insurance Commissioner levied a $1.5 million fine with $1 million suspended pending no further violations over the next two years.

49.     Following the order, Centene issued a press release stating that it was addressing "known issues in [its] network."

50.     Coordinated Care also sent a letter to its Washington members acknowledging that "members may have had difficulty in obtaining health benefits, care, or were charged more for services than expected."

51.     The Centene network adequacy issues that the Washington Office of Insurance Commissioner identified are present in Florida and in other states throughout the United States.

**F. Defendants' Failure to Pay Claims, Resulting in Even Smaller Networks and Lack of Benefits and Coverage**

52.     Defendants routinely deny coverage for medical services, claiming that the provider did not show sufficient diagnostic evidence that the care was necessary. Centene and a subsidiary were sued in 2016 by a group of providers who alleged that Defendants wrongfully denied claims of their members within the scope of the members' Ambetter policies.

53.     As a result of this practice of denying legitimate claims, many providers will not accept patients insured by Ambetter, making it even more difficult for Ambetter members to find in-network providers.

**G. Plaintiff's and Class Members' Experiences with Ambetter**

54.     Plaintiff Houston viewed the information supplied by Centene, Sunshine Health, and Celtic Insurance through www.ambetter.sunshinehealth.com in November 2016. Among the information he reviewed was (1) the Summary of Benefits and Coverage under the heading Ambetter from Sunshine Health: Ambetter Balanced Care 4 (2017); and (2) the "Ambetter" Balanced Care 4 (2017) Plan Brochure ("2017 Plan Brochure"). After reviewing this information, he bought a Centene Ambetter Health insurance policy from Sunshine Health that is insured by Centene owned Celtic Insurance, Silver Metal type, on the Florida Benefit Health Exchange in November 2016.

55.     The 2017 Plan Brochure represents that Ambetter "provides quality healthcare solutions" with coverage options that make it "easier to take charge of your health." It further states that, "By choosing Ambetter from Sunshine Health, you'll receive affordable, quality healthcare coverage...." The 2017 Plan Brochure also represents that the "Providers listed in the Ambetter from Sunshine Health online directory are in-network." The 2017 Plan Brochure and

Plan Summary also purport to describe generally what services are covered and what are not, but are misleading by failing to indicate how few in-network providers would be available.

56.     Plaintiff Houston also viewed the information supplied by Centene, Sunshine Health, and Celtic Insurance through www.ambetter.sunshinehealth.com around November 2017. Among the information he reviewed was (1) the Summary of Benefits and Coverage under the heading Ambetter from Sunshine Health: Ambetter Balanced Care 4 (2018), (2) the "Ambetter" Balanced Care 4 (2018) Plan Brochure ("2018 Plan Brochure"). After reviewing this information, he bought a Centene Ambetter Health insurance policy from Sunshine Health that is insured by Centene owned Celtic Insurance, Silver Metal type, on the Florida Benefit Health Exchange around November 2017.

57.     The 2018 Plan Brochure represents that Ambetter "provides quality healthcare solutions" with coverage options that make it "easier to take charge of your health." It further states that, "By choosing Ambetter from Sunshine Health, you'll receive affordable, quality healthcare coverage. . .." The 2018 Plan Brochure also represents that the "Providers listed in the Ambetter from Sunshine Health online directory are in-network." The 2018 Plan Brochure and Plan Summary also purport to describe generally what services are covered and what are not, but are misleading by failing to indicate how few in-network providers would be available.

58.     Plaintiff Houston also viewed the information supplied by Centene, Sunshine Health, and Celtic Insurance through www.ambetter.sunshinehealth.com around November 2018. Among the information he reviewed was (1) the Summary of Benefits and Coverage under the heading Ambetter from Sunshine Health: Ambetter Balanced Care 11 (2019), (2) the "Ambetter" Balanced Care 11 (2019) Plan Brochure ("2019 Plan Brochure"). After reviewing this information Plaintiff Houston bought a Centene Ambetter Health insurance policy from

Sunshine Health that is insured by Centene owned Celtic Insurance, Silver Metal type, on the Florida Benefit Health Exchange around November 2018.

59.     The 2019 Plan Brochure represents that Ambetter "provides healthcare solutions." It further states that, "By choosing Ambetter from Sunshine Health, you'll receive affordable, healthcare coverage. . .." The 2019 Plan Brochure also represents that the "Providers listed in the Ambetter from Sunshine Health online directory are in-network." The 2019 Plan Brochure and Plan Summary also purport to describe generally what services are covered and what are not, but are misleading by failing to indicate how few in-network providers would be available.

60.     In or around March 2017, Plaintiff Houston needed medical services and searched his online Ambetter account for an in-network provider. After several phone calls to in-network providers Ambetter listed, Plaintiff discovered that the providers Ambetter listed either (a) did not accept Ambetter; (b) were retired, or (c) were deceased. After exhaustingly calling in-network providers Ambetter listed, Plaintiff eventually found an in-network provider that accepted Ambetter.

61.     This provider referred Plaintiff to a ears nose and throat specialist. Plaintiff had to travel about 45 minutes to find such in-network specialist who accepted Plaintiff's Ambetter insurance.

62.     These experiences are similar to those of the Class, who consistently encounter difficulties in finding a medical provider willing to accept the Ambetter plan.

**H. Class Action Allegations**

63.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and LR 23 (i) on behalf of the following class: All persons in the state of Florida who were insured by Defendants'

Ambetter insurance product which was purchased through an ACA HIE from February 15, 2019 to the present (the "Class"). Excluded from the Class are Defendants, Defendants' employees, Defendants' subsidiaries, the Judge(s) to whom this case is assigned and the immediate family of the Judge(s) to whom this case is assigned.

64.     This Class Definition may be amended or modified as warranted by discovery or other activities in the case hereafter.

65.     Numerosity: The Class encompasses thousands of individuals, which is so numerous that joinder of all members is impracticable. The Class is ascertainable from Defendants' records.

66.     Typicality: Plaintiff's claims are typical of the claims of the Class, because Plaintiff and the members of the Class each purchased a Centene Ambetter policy and were similarly damaged thereby. Plaintiff and the other members of the Class also share the same interest in preventing Defendants from engaging in such activity in the future.

67.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff has retained counsel competent and experienced in class and consumer litigation and have no conflict of interest with other members of the Class in the maintenance of this class action. Plaintiff has no relationship with Defendants except as a policyholder who entered into contracts with Defendants. Plaintiff will vigorously pursue the claims of the Class.

68.     Existence and Predominance of Common Questions of Fact and Law: this case presents many common questions of law and fact that will predominate over questions affecting members of the Class only as individuals. The damages sustained by Plaintiff and the Class's

members flow from the common nucleus of operative facts surrounding Defendants' misconduct. The common questions include, but are not limited to:

a.  Whether Defendants' failure to provide the coverage required by the ACA violated Florida law as set forth herein;

b.  Whether Defendants breached their contracts with Plaintiff and the Class by failing to provide the coverage promised and mandated through the conduct alleged herein;

c.  Whether Defendants' misrepresentation of their insurance plans' coverage was an unfair and deceptive business practice;

d.  Whether Defendants or their agents pursued uniform policies and procedures in their Ambetter policy sales, customer service, and/or claims processing;

e.  Whether Defendants failed to comply with the terms of the Ambetter health insurance policies;

f.  Whether Centene operated Sunshine Health as a shell or alter ego such that the law should disregard its separate corporate identities;

g.  Whether Centene operated Celtic Insurance as a shell or alter ego such that the law should disregard its separate corporate identities; and

h.  Whether Plaintiff and Class members are entitled to monetary damages or injunctive relief and/or other remedies and, if so, the nature of any such relief.

69.    Superiority:    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the members of the Class to individually seek redress from the wrongs done to them. Plaintiff believes that members

19

of the Class, to the extent they are aware of their rights against Defendants, would be unable to secure counsel to litigate their claims individually because of the relatively limited nature of the individual damages, and thus, a class action is the only feasible means of recovery for these individuals. Even if members of the Class could afford such individual litigation, the court system could not. Individual litigation would pose a high likelihood of inconsistent and contradictory judgments. Further, individualized litigation would increase the delay and expense to all parties and the court system, due to the complex legal and factual issues presented by this dispute. In contrast, the class action procedure presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. This action presents no difficulties in management that would preclude its maintenance as a class action.

70.     In addition, or in the alternative, the Class may be certified because:

    a.  The prosecution of separative actions by the individual members of the Class would create risk of inconsistent or varying adjudication regarding individual members of the Class that would establish incompatible standards of conduct for Defendants;

    b.  The prosecution of separate actions by individual members of the Class would create a risk of adjudications regarding them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede the ability to protect their interests; and

    c.  Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final and injunctive relief regarding the Class. In

addition, Plaintiff has alleged, and intended to show, that any corporate formalities between the Defendants should be disregarded.

**COUNT I**
**Breach of Contract**
**(Against Defendants Sunshine Health and Celtic Insurance)**

71.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1-70, as if fully set forth here verbatim.

72.     Plaintiff and the members of the Class entered into valid and binding written contracts with Sunshine Health and Celtic Insurance for the purchase of Ambetter insurance policies. Exhibit A (2017). Exhibit B (2018), Exhibit C (2019).

73.     Defendants' policies state that, under the policy Plaintiff and members of the Class have the "right to" (a) "A current list of Network Providers;" and (b) "Adequate access to qualified Physicians and Medical Practitioners and treatment or services regardless of. . . geographic location, health condition, national origin or religion."

74.     Defendants' policies further state that, "We and the Member shall comply with all applicable state and federal laws and regulations in performance of this Contract."

75.     For the reasons alleged above, Sunshine Health and Celtic Insurance breached each of these provisions of the policies issued to Plaintiff and members of the Class.

76.     Plaintiff and members of the Class have performed all conditions precedent to the application of the policies.

77.     Plaintiff and members of the Class suffered damages as a direct and proximate result of Sunshine Health and Celtic Insurance's breach of contract.

78.     Every contract contains an implied covenant of good faith and fair dealing.

79.     Defendants' conduct, including failing to provide accurate information regarding their provider network, failing to provide a sufficient network of providers, and collecting premiums while failing to provide an adequate network of providers, destroyed Plaintiff and members of the Class' rights to receive the benefits of their contracts with Sunshine Health and Celtic Insurance.

80.     As a result of the foregoing, Plaintiff and members of the Class are entitled to:

a.   An order requiring Sunshine Health and Celtic Insurance to perform their contract as they agreed to do; and

b.   Benefit-of-the bargain compensatory damages to Plaintiff and members of the Class in a sum equivalent to performance of the contract that places Plaintiff and Class members in the positions they would occupy if the contracts had been fulfilled rather than breached.

**COUNT II**
**Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**(Against all Defendants)**

81.     Plaintiff and the Class repeats and re-alleges paragraph 1-70 above, as if as if fully set forth here verbatim.

82.     Plaintiff and the Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

83.     Defendant was engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

84.     Defendants engaged in unfair acts or practices in the conduct of their business by failing to provide accurate information regarding their provider network, failing to provide a sufficient network of providers as represented, and collecting premiums while failing to provide

an adequate network of providers, failing to have sufficient providers within the Ambetter network as represented, by violating the ACA, and by omitting material facts regarding the benefits and coverage of Ambetter policies. This conduct constitutes unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204, *et seq*.

85.     A reasonable consumer, like Plaintiff, would be deceived by Defendants' conduct in promoting and offering health insurance.

86.     Plaintiff and the Class suffered damages because the Ambetter insurance policies they purchased failed to provide accurate information regarding their provider network and failed to provide a sufficient network of providers. For example, Plaintiff Houston needed medical services and searched his online Ambetter account for an in-network provider. After several phone calls to in-network providers Ambetter listed, Plaintiff discovered that the providers Ambetter listed either (a) did not accept Ambetter; (b) were retired, or (c) were deceased. After exhaustingly calling in-network providers Ambetter listed, Plaintiff eventually found an in-network provider that accepted Ambetter. Additionally, Plaintiff had to travel 45 minutes to find a ears, nose, and throat specialist that would accept Ambetter.

87.     Because Defendants' insurance plan does not provide accurate information regarding their provider network or provide a sufficient network of providers, despite collecting Plaintiff and Class members premium payments, Defendants caused Plaintiff's damages.

88.     As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiff and Class members suffered actual damages within the meaning of Fla. Stat. § 501.211 because the Ambetter policies that Plaintiff purchased failed to live up to Defendants' representations regarding the Ambetter policy.

**Prayer for Relief**

89.     WHEREFORE, Plaintiff, individually and behalf of the members of the Class, prays for relief as follows:

A.  Enter an order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative, and designating the undersigned as Class counsel;

B.  An order awarding damages to Plaintiff and the members of the Class, including, where appropriate, exemplary damages, and all other monetary relief to which Plaintiff and the Class are entitled;

C.  An order awarding restitutionary disgorgement to Plaintiff and the Class;

D.  An order awarding non-restitutionary disgorgement to Plaintiff and the Class;

E.  A declaration that Defendants have violated applicable state law and an order requiring Defendants to immediately cease and desist their unlawful, deceptive, and obstructive practices with respect to the marketing, administration, and claims processing of the Ambetter health insurance plan;

F.  An order awarding attorneys' fees and costs; and

G.  Such other and further relief as may be just and equitable.

**JURY TRIAL DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

**VARNELL & WARWICK, P.A.**


Dated: February 16, 2019                   BY:    /s/ JANET R. VARNELL
                                           Janet R. Varnell (FBN 0071072)
                                           Brian W. Warwick (FBN 0605573)
                                           jvarnell@varnellandwarwick.com
                                           bwarwick@varnellandwarwick.com

P.O. Box 1870
Lady Lake, FL 32158
Telephone: (352) 753-8600
Facsimile: (352) 504-3301

Seth Lesser, *Pro Hac Vice to be filed*
Kurt B. Olsen, *Pro Hac Vice to be filed*
Fran Rudich, *Pro Hac Vice to be filed*
seth@klafterolsen.com
ko@klafterolsen.com
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York 10514
Telephone: (914) 934-9200

Beth Terrell, *Pro Hac Vice to be filed*
Jennifer Murray, *Pro Hac Vice to be filed*
Elizabeth Adams, *Pro Hac Vice to be filed*
Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603

Robert S. Green, *Pro hac vice to be filed*
James Robert Noblin, *Pro hac vice to be filed*
GREEN & NOBLIN, P.C.
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA 94939
Telephone: (415) 477-6700
Email: gnecf@classcounsel.com

David Martin, *Pro hac vice to be filed*
dhmartin99@gmail.com
Mark Ravis, *Pro hac vice to be filed*
mravis99@gmail.com
MARK RAVIS & ASSOCIATES
1875 Century Park East, Suite 700
Los Angeles, California 90067
Tel: (310) 295-4145

*Counsel to Plaintiff*